**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARY SERSHEN,

    Plaintiff,

        v.

EUGENE CHOLISH, et al.,

    Defendants.

CIVIL ACTION NO. 3:07-CV-1011

(JUDGE CAPUTO)

**<u>MEMORANDUM</u>**

Presently before the Court are three motions for summary judgment: (1) Plaintiff Mary Sershen's Motion for Summary Judgment (Doc. 64); (2) Defendant Stillwater Environmental Services, Inc.'s Motion for Summary Judgment (Doc. 72); and (3) Defendants Borough of Archbald, Robert Harvey, J. Scotty Lemoncelli, and Eugene Cholish's Motion for Summary Judgment (Doc. 79). Also presently before the Court is Plaintiff's Motion to Strike (Doc. 104) two filings by the Borough of Archbald (Docs. 102, 103). Plaintiff's Motion to Strike will be granted in part and denied in part. The Plaintiff's Motion for Summary Judgment will be denied as stated below. The Defendants' motions will be granted in part and denied in part. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 ("federal question jurisdiction").

**BACKGROUND**

Plaintiff Mary Sershen ("Sershen") was a part owner of a home at 590 Main Street, Eynon, Pennsylvania ("the Barth property"), along with her ex-husband David Barth and her father Leonard Sershen. (Deed to 590 Main St., Doc. 66 Ex. 34.)[1]

---

[1] In July 2006, there was a judgment entered against Sershen, David Barth and Leonard Sershen by Wells Fargo Bank, the mortgagor, which ultimately resulted in a

Defendant Stillwater Environmental Services, Inc. ("Stillwater") is a corporation which performs hauling and demolition work. (Glenn Bay Dep. 7:3-6, Mar. 4, 2009.) Stillwater is owned by Glenn Bay and Brian Roland. (Bay Dep. 7:21-22.) Stillwater does not have any employees, and did not have any during the relevant time period in 2006. (Bay Dep. 7:7-10.) Robert Noldy ("Noldy") was authorized to act as an agent for Stillwater and to submit bids on its behalf. (Bay Dep. 15:7-13.) Robert Bronson ("Bronson") did not work for Stillwater, and was never paid by Stillwater. (Bronson Dep. 13:15-18, 21-23, Feb. 11, 2009.) Bronson had known Noldy for more than twenty years, and occasionally socialized with him. (Bronson Dep. 11:12-12:21.)

The Borough of Archbald ("Archbald") is a duly organized municipality of the Commonwealth of Pennsylvania. (Amend. Compl. ¶ 7, Doc. 57; Answer ¶ 3, Doc. 68) Defendant Robert Harvey ("Harvey") was at all times relevant to this litigation the Fire Chief for Archbald. (Answer ¶ 2.) Defendant J. Scotty Lemoncelli ("Lemoncelli") was at all relevant times the zoning and code enforcement officer for Archbald. (Answer ¶ 2.) Officer Eugene Cholish ("Cholish") was at all relevant times a police officer for the Borough of Archbald. (Answer ¶ 2.) Collectively, they are the Archbald Defendants.

## I. Factual Background

### A. Fire at the Barth property

On July 11, 2005, a fire occurred at the Barth property causing extensive damage to the house. (Sershen Dep. 157:20-25, Mar. 30, 2009.) Anyone who viewed the property could "obviously" see the structure was involved in a fire. (Cholish Dep. 57:16-17, Mar. 11,

judicial sale of the property in April 2007. (Sershen Dep. 152:24-153:25.)

2009.) According to Harvey, immediately after the fire the Barth property could have been salvaged, but over time the building deteriorated and became unsafe. (Harvey Dep. 92:11-14, Feb. 3, 2009.)

During an inspection of the Barth property at the end of February 2006, Lemoncelli noted the following dangers: (1) the first floor kitchen was badly damaged; (2) the stairway from the basement to the first floor was charred badly and very unsafe; (3) the floor joist and living room suffered fire damage and was unsafe; (4) a lot of wiring had been removed; (5) the exterior siding was damaged by the fire; (6) all the copper tubing had been removed from sinks and the bathroom; (7) the furnace system was destroyed and mostly removed; (8) all basement baseboard heating was removed; (9) the doors needed to be re-secured; and (10) vinyl siding was stripped from the building. (Lemoncelli Inspection Notes 1.) There was a lot of debris all over the house on the first floor. (Bronson Dep. 28:19-24.) There was concern that the structure began to emit foul odors, and that it was becoming an increasing risk for another fire. (Harvey Dep. 87:24-88:13.) The home on the property was approximately fifteen feet from the nearest home. (Noldy Dep. 89:8-11, Feb. 11, 2009.) There were animals in the home and overgrown brush around the back of the home. (Joseph Daley Dep. 20:3-11, Nov. 18, 2008.) The windows were all broken, the glass on the doors was broken, and the rear of the house was open. (Bronson Dep. 68:1-10.) The inside of the home was not habitable with debris all over the place including rotting food, clothing, and garbage. (Bronson Dep. 68:16-69:3.) Noldy had demolished approximately three hundred (300) homes since 1987, and in his opinion the property needed to be demolished. (Noldy Dep. 87:22-88:8.) It was not, however, the worst building Noldy had ever seen.

3

(Noldy Dep. 88:9-16.) In his letter to the Borough reporting on his inspection, Harvey did not mention having any physical difficulties doing the walk-through. (Anthony Giordano Dep. 76:8-13, Aug. 5, 2008.) Sershen disputes many of the conclusions as to the extent of the damage. (Sershen Dep. 202:3-203:25, 206:25-208:9.)

B. Inspections and the Decision to Demolish

As noted, Lemoncelli inspected the Barth property around the end of February 2006. (Lemoncelli Inspection Notes 1.) Lemoncelli did not have permission or a warrant to search the home. (Lemoncelli Dep. 89:17-90:10, Jan. 26-27, 2009.) Harvey inspected the property on June 12, 2006. (Harvey Dep. 127:5-7.) Harvey did not have permission or a warrant to search the home. (Harvey Dep. 127:18-128:5.) Harvey's search was based upon the premise that the home was "unsafe." (Harvey Dep. 146:24-147:13.) Harvey inspected the property after being advised to do so by the Borough Council at the request of the Borough Solicitor. (Giordano Dep. 76:4-7.) Harvey did not know what steps Lemoncelli was taking in connection with the Barth property. (Lemoncelli Dep. 165:22-25.) Lemoncelli did know about Harvey's inspection of the Barth property. (Lemoncelli Dep: 166:1-12.) Harvey's interaction with Lemoncelli is strictly through the Borough at work sessions and Council Meetings, or when Harvey needed a zoning permit for his personal use. (Harvey Dep. 50:2-8, 9-16.)

Both Lemoncelli and Harvey recommended to the Borough council that the house be demolished because it was unsafe. (Lemoncelli Dep. 98:3-6, 98:20-99:3.) After hearing the results of the inspection by Harvey, the Borough believed the property was an imminent threat to the neighborhood. (Giordano Dep. 21:4-20, 24:2-8, 64:7-14.) It was determined

4

that the building should be taken down pursuant to the unsafe building ordinance as an emergency, rather than under the public nuisance ordinance. (Lemoncelli Dep. 85:12-15.) At least some members of the Borough Council believed there was some kind of an emergency situation. (John Altier Dep. 99:13-100:10, 135:20-4, Jan. 21, 2009; Daley Dep. 79:7-11.) Harvey was concerned that the building was an ever increasing fire risk, which could in turn endanger the lives of the Borough's firefighters. (Harvey Dep. 87:14-88:7.) Harvey also stated that in his experience a property which sits for longer than three (3) to six (6) months after a fire without being repaired "is probably going to end up burning to the ground somehow." (Harvey Dep. 88:8-18.) During the six months after the fire the Barth property had become increasingly deteriorated and nothing had been done to repair it. (Harvey Dep. 87:14-23.)

The Borough Council instructed Lemoncelli to obtain three bids for the work demolishing the property.[2] (Lemoncelli Dep. 118: 10-16; Harvey Dep. 125:8-13.) Three bids were submitted for the demolition of the property, and the contract was awarded to Stillwater through Noldy. (Archbald Borough Meeting Notes 3, Aug. 16, 2006.) The Council was notified that Stillwater had the lowest bid before the proposal from Stillwater was accepted. (Lemoncelli Dep. 123:21-22.) The decision to demolish the property was made based on a consensus of the Borough Council. (Giordano Dep. 79:22-80:1.) Lemoncelli stated that there was never a vote taken by the Borough Council to demolish the property. (Lemoncelli Dep. 101:17-102:4.) Borough Councilman Giordano stated that only the Borough had the

---

[2] In accordance with 40 P.S. § 638, the Borough received an award of $10,000 from the Allstate Insurance Company, proceeds from the fire insurance policy owned by the Plaintiff for the Barth property, for demolition or other necessary steps in the event of an emergency. (Giordano Dep. 117:24-118:4.)

authority to go forward with the demolition of the Barth property. (Giordano Dep. 88:23-25.)

C.  Notice to Sershen

Attempts were made to contact Sershen before the property was demolished. (Giordano Dep. 55:11-18.)  Lemoncelli's initial attempts to locate Sershen and her ex-husband were unsuccessful.  (Daley Dep. 71:5-12, 72:12-19, 73:2-6.)  Lemoncelli spoke twice with Sershen's father.  (Lemoncelli Dep. 42:14-16.)  Lemoncelli was given the impression that Sershen's father did not know where Sershen was living.  (Lemoncelli Dep. 42:21-25.)  Archbald Borough Councilman Joseph Daley was also told by Sershen's father that he did not know where Sershen was living.  (Daley Dep. 56:2-12, 58:4-10.)  Sershen's father met twice with Archbald officials about the Barth property.  (Leonard Sershen Dep. 65:12-23, 69:5-17, 76:9-14, 83:12-13, Apr. 30, 2009.)  After one meeting he informed Sershen that he had attended the Borough meeting.  (Leonard Sershen Dep. 76:19-22.)

Lemoncelli told Sershen the property was going to be torn down in mid-summer 2006 when Sershen called him. (Lemoncelli Dep. 53:1-54:17, 169:15-170:15.) This conversation with Sershen was ten (10) days or a few weeks before the demolition.  (Lemoncelli Dep. 170:16-20.)  Sershen asserts that she did not call Lemoncelli before August 19, 2006.[3] (Sershen Dep. 215:9-11.)  Instead, she asserts that the call was sometime between August 22 and 24.  (Sershen Dep. 215:12-15.)  Sershen was not given notice by Lemoncelli describing why the house was unsafe or what improvements needed to be made. (Lemoncelli Dep. 35:8-14.) Sershen also received a letter from the Borough solicitor, dated April 24, 2006, which requested information about the outstanding insurance claim on the

---

[3] This is the date when Sershen encountered Bronson and Cholish at the Barth property, discussed *infra* Part E.

property.  (Sershen Dep. 197:19-199:13.)  Sershen knew in April of 2006 that the Borough was seeking the insurance funds to pay for the demolition of the property.  (Sershen Dep. 199:17-22.)

There is also conflicting testimony as to whether any notice was posted on the Barth property itself.  Lemoncelli testified that there was a posting on the house on a continuous basis from March 2006 until August 2006.  (Lemoncelli Dep. 57:18-25.)  Borough Councilman Daley believed that the property was posted two (2) or three (3) times by Lemoncelli.  (Daley Dep. 56:14-18.)  Bronson believed that he saw a condemnation notice on the front bottom door of the property, or at least thought that his brother told him it was a condemnation notice.  (Bronson dep. 31:21-32:19.)  Officer Cholish recalled seeing  a yellow posting on the property which said no trespassing.  (Cholish Dep. 65:20-66:13.)  Wells Fargo Bank, the company holding the mortgage to the property, also posted on the property.  (Lemoncelli Dep. 37:19-21, 49:21-50:8.)  Sershen did not see any postings at all.  (Sershen Dep. 54:4-13.)   Glenn Bay, Stillwater's owner, also did not notice any signs on the front door.  (Bay Dep. 37:1-3.)

D.  Actions by Stillwater and Bronson

Lemoncelli approached Noldy and requested that he make a bid for the demolition of the Barth property.  (Noldy Dep. 27:1-21.)  Noldy presumed that the Borough owned the property.  (Noldy Dep. 48:2-6.)  Noldy believed that the Borough owned the property because the insurance company had sent them a check to raze the building.  (Noldy Dep. 49:21-24.)  Glenn Bay was also of the belief that the Borough owned the property.  (Bay Dep. 29:17-23.)  Bronson assumed that Archbald owned the property because he thought he saw a

condemnation notice on the Barth property. (Bronson Dep. 31:17-20.) Bronson told Officer Cholish that he knew there was a contract with the Borough to demolish the house. (Cholish Dep. 60:25-61:1.) Bronson stated that he did not have a copy of the contract, but that Noldy did. (Cholish Dep. 61:2-5.)[4] Noldy never stopped the demolition to investigate the ownership of the Barth property. (Noldy Dep. 58:12-17.) It is not part of Stillwater's procedure to make sure that the homeowner is actually authorizing the demolition. (Noldy Dep. 48:20-25.)

Bronson was told by Noldy that he could have some lumber from the property, and showed him what he could have. (Bronson Dep. 16:6-15.) Materials from the demolition would have otherwise gone to the landfill. (Noldy Dep. 67:9-11.) Bronson ultimately removed about seven (7) sheets of plywood and about twenty-four (24) two-by-fours (2x4). (Bronson Dep. 23:19-21.) Bronson did not pay anyone for the wood. (Bronson Dep. 24:10-12.) Bronson also removed a window, but it was not usable and was eventually thrown in the garbage. (Bronson Dep. 57:14-58:9.)

E. Encounter with the Police

On August 19, 2006, Cholish was dispatched to the Barth property. (Cholish Dep. 54:1-2., Doc. 66.) Cholish was told that "unknown actors [were] taking down a house" at that address. (Cholish Dep. 56:1-3.) Upon arriving at the scene, Cholish spoke with Sershen, who was standing on the lawn in front of the house. (Cholish Dep. 56:20-22, 60:1-4.) Sershen's daughter was also there. (Bronson Dep. 36:5-7.) A neighbor, Mrs. Delonti was outside standing on her porch during this time. (Sershen Dep. 67:6-11.) Sershen claimed

---

[4] Cholish states "Mr. Knowles" in his deposition, but he appears to be referring to Noldy.

that there were workers tearing down her house, and that they had no paperwork for doing so. (Cholish Dep. 56:22-25.) Cholish saw a truck and a trailer pulled along the side of the house, along with several people walking around. (Cholish Dep. 58:17-20.) Bronson stated that Sershen had been trying to go into the house prior to Cholish's arrival. (Cholish Dep. 88:9-17.) Bronson asked to have Sershen removed from the property, because he did not want her near the work for safety reasons. (Cholish Dep. 61:7-16.)[5]

Cholish called Mike Zielinski, crew manger for the Archbald Department of Public Works, to inquire about the demolition. (Cholish Dep. 61:22-24.) Zielinski called Cholish back and told him that he was informed by Harvey that a contract was awarded at the last Borough meeting to a company to demolish the home. (Cholish Dep. 62:14-18.) Cholish then informed Sershen that there was a contract to take down the home. (Cholish Dep. 62:22-25.) Cholish asked her to "step off the property due to safety reasons." (Cholish Dep. 63:3-8.) Cholish needed to ask her again to step off the property. (Cholish Dep. 63:16-20.) Sershen then walked out to the roadway, where Cholish informed her that she needed to stay off the property, or else she would be arrested for trespassing and disorderly conduct. (Cholish Dep. 63:21-25.) Sershen acknowledges that she was told that she had to stay off the property because it was being torn down. (Sershen Dep. 62:6-8.) Sershen, however, does not recall that Cholish warned her she would be arrested for trespassing if she returned. (Sershen Dep. 64:4-17.)

---

[5] During the encounter, Cholish asserts that Sershen was yelling obscene language at Bronson and the other workers, and that Cholish asked her to stop. (Cholish Dep. 61:18-21, 63:1-2) Sershen asserts that she was not using obscene language or screaming. (Sershen Dep. 55:17-23.)

Sershen left the property, went back to her apartment, then returned with a camera to take pictures of the demolition. (Sershen Dep. 69:2-11.) Cholish returned to the Barth property along with Officer Minelli. (Cholish Dep. 104:8-11.) Bronson stated to Cholish that Sershen had walked up alongside the house, had gone around back, and was trying to get in the house. (Cholish Dep. 101:21-24.) Sershen stated that she did not see Cholish speak with Bronson at all before she was arrested. (Sershen Dep. 93:2-5.) Sershen also stated that she was never on the Barth property during that time. (Sershen Dep. 74:22-24.) Sershen stated that she walked along a narrow strip of land owned by the Borough[6] between her home and her neighbors, far enough from the road so that she was parallel with the rear bedroom walls that were being taken down. (Sershen Dep. 70:20-71:4.) Sershen was far enough back that when workers standing "down towards the front" of the property called out to her that she should not be there, she could not see who was talking. (Sershen Dep. 71:19-72:6, 73:22-74:1.) Cholish went over to Sershen and told her she was being arrested for defiant trespass. (Cholish Dep. 102:5-13, 117:16-20, 118:1-4.)

Cholish transported Sershen to the station, and placed her in a cell. (Cholish Dep. 103:18-21.) She was placed in the cell because she was being charged with defiant trespass, a third degree misdemeanor, and she needed to be transported to the Lackawanna Processing Center after the criminal complaint was completed. (Cholish Dep. 103:18-104:5.)

---

[6] There was a narrow strip of land between the Barth property and the neighbors which was owned by the Borough where a road formerly went "up into the coal or something" in the woods behind the property. (Sershen Dep. 30:20-24.) There was a stone wall a little over four (4) feet high between the Borough property and the Barth property, but it only extended a few feet along the property line. (Sershen Dep. 32:15-33.) Sershen's conversation with Bronson occurred "about a foot away" from this wall. (Sershen Dep. 33:10-14.)

There was no other officer there at the time to watch her while Cholish completed the complaint. (Cholish Dep. 136:6-11.) Sershen was left in the cell while Cholish completed the paperwork, because it was the station policy to lock them up if they must be left alone to keep them from simply walking out of the station. (Cholish Dep. 132:17-24.) The Chief of Police happened to walk in and convinced Cholish to file only charges for disorderly conduct and to release Sershen. (Cholish Dep. 134:16-19, 139:6-13.) Cholish used his discretion in deciding to only charge Sershen with one offense under § 5503(a)(4). (Cholish Dep. 147:19-21.) Cholish asserts that Sershen was in the cell for approximately ten (10) minutes. (Cholish Dep. 135:5-6.) Sershen asserts that she was in the cell for thirty (30) to forty-five (45) minutes. (Sershen Dep. 89:23-90:1.)

Other than trying to reach Noldy through Bronson, Cholish made no other attempt to determine if the house was to be demolished beyond calling Zielinski. (Cholish Dep. 79:22-80:8.) Cholish had the authority to stop the demolition. (Cholish Dep. 84:16-24.) Nobody actually produced any paperwork verifying that the demolition should go on. (Cholish Dep. 85:25-86:4.) The property was demolished a few days after Sershen's encounter with Bronson and the police. (Noldy Dep. 64:23-65:2, 65:23-66:5.)

## II. Procedural background

On June 1, 2007, Sershen filed a complaint in the United States District Court of the Middle District of Pennsylvania. (Doc. 1.) With leave of the Court, she filed an Amended Complaint on July 30, 2009. (Doc. 57.) Sershen filed a Motion for Summary Judgment on August 31, 2009. (Doc. 64.) Defendant Stillwater filed a Motion for Summary Judgment on September 11, 2009. (Doc. 72.) The Archbald Defendants also filed a Motion for Summary Judgment on September 11, 2009. (Doc. 79.) On October 7, 2009, Sershen filed a Motion

to Strike Docket Numbers 102 and 103 for failure to comply with the Federal Rules of Civil Procedure.  (Doc. 104.)  Each of these motions has been fully briefed, and are now ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  Id.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  Id.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

### I. Motion to Strike

Sershen has moved to strike two submissions by the Archbald Defendants, their Reply Brief in Support of Archbald's Motion for Summary Judgment (Doc. 102), and an Amended Response to Plaintiff's Statement of Material Facts (Doc. 103). Sershen argues that the Defendants have inappropriately used their opportunity to reply in defense of their own motion for summary judgment, for the purpose of responding to arguments made in support of the Plaintiff's motion for summary judgment. Specifically, that any discussion in the Reply Brief (Doc. 102) should be limited to issues raised in the Plaintiff's Brief in Opposition (Doc. 95). Furthermore, Sershen argues that Archbald has already filed a

counter-statement of facts (Doc. 86) under Local Rule 56.1, and that they may not file an amended version without leave of this Court.

While Sershen correctly identifies that Archbald's submissions are technically inappropriate the Federal Rules of Civil Procedure and the Local Rules, I find that in general Sershen is not prejudiced by these submissions. Archbald's amended counter-statement of facts incorporates the same responses that were previously articulated in their first statement, simply in a manner more compliant with Local Rule 56.1. Sershen is not prejudiced by this statement of facts, and indeed the record contains a great deal of evidence submitted by all parties through each of their respective motions for summary judgment. There have been ample opportunities for Sershen to respond to the Defendants' submissions. Similarly, while there is some language in Archbald's Reply Brief (Doc. 102) inappropriately directed at the Plaintiff's Reply Brief in defense of their own motion (Doc. 94), the majority of the arguments are appropriate. I agree with Sershen only as to one specific submission: the documents attached as exhibits to the Reply Brief (Doc. 102). These documents were not submitted at any other time, and as Sershen correctly argues she was never given an opportunity to respond. Therefore, the exhibits attached to Archbald's Reply Brief (Doc. 102) will be stricken from the record. Except as to the two exhibits attached to docket number 102, Sershen's motion to strike will be denied. These exhibits, however, are not material to the motions presently before this Court, and I will now evaluate each of the parties' requests for summary judgment.

## II. Motions for Summary Judgment

Plaintiffs' Amended Complaint contains twelve (12) counts. Counts I - IV are against Defendant Cholish alleging violations of Sershen's Fourth Amendment rights (Count I), violations of her First Amendment rights (Count II), false imprisonment (Count III), and malicious prosecution (Count IV). At Count V Sershen alleges that Defendant Lemoncelli violated her due process rights. At Count VI she alleges that Defendant Harvey also violated her due process rights. At Count VII Sershen alleges that Lemoncelli and Harvey violated her Fourth Amendment rights. At Count VIII she alleges that the Borough of Archbald violated her Fifth Amendment right by seizing her property without just compensation, and that the Borough violated her due process rights. At Count IX Sershen alleges that Defendant Stillwater unlawfully converted her property. At Count X she alleges that Stillwater was negligent in destroying her property. At Count XI Sershen alleges that a civil conspiracy existed between Cholish, Harvey, and Lemoncelli. At Count XII she alleges that Stillwater engaged in a civil conspiracy.

### A. Claims Arising from the Arrest (Counts I-IV)

Both Sershen and Cholish argue they are entitled to summary judgment on Counts I through IV, based upon the Cholish's arrest of Sershen on August 19, 2006. The existence of probable cause for the arrest is central to the determination of whether summary judgment is appropriate for either party. The Supreme Court has adopted a "totality of the circumstances" approach when examining the existence of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As such, the presence of probable cause is most often regarded as a factual question for the jury in civil actions brought pursuant to § 1983. *Merkle v. Upper*

*Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000). A district court is, however, permitted to "conclude 'that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding." *Id.* at 788-89 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003). Probable cause "does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt," but it does require "more than mere suspicion." *Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995).

There are several genuine factual disputes about the events of August 19, 2006. For example, whether Sershen was yelling and cursing (*compare* Cholish Dep. 18-21, 63:1-2 *with* Sershen Dep. 55:17-23), or whether Cholish first received information from Bronson before arresting Sershen (*compare* Cholish Dep. 101:21-24 *with* Sershen Dep. 93:2-5). These disputes, however, are not material because the issue of probable cause may be resolved by other facts which are not in dispute. The record clearly demonstrates that Cholish was called to the Barth property. (Cholish Dep. 54:1-2.) Once there, Cholish made a phone call and was under the impression that the property was to be torn down. (Cholish Dep. 62:14-18.) Cholish instructed Sershen to leave the property. (Sershen Dep. 62:6-8.) Both Sershen and Cholish then left the property. (Sershen Dep. 64:4-17; Cholish Dep. 104:8-11.) Cholish was called back and found Sershen standing towards the back of the house, even with the rear bedroom wall. (Sershen Dep. 70:20-71:4.) At that point Cholish

arrested Sershen for defiant trespass. (Cholish Dep. 102:5-13.) Considering only these facts which are not in dispute, and doing so in the light most favorable to the Plaintiff, no reasonable jury could determine that Cholish lacked probable cause to arrest Sershen.[7] Cholish reasonably believed that Sershen was trespassing, creating probable cause for the arrest. 18 P.S. § 3503(b) (trespass). While Sershen was ultimately charged with another offense (Cholish Dep. 147:19-21), Cholish undoubtedly had probable cause to arrest for defiant trespass after seeing Sershen back on the property after she was instructed to leave. Given this undisputed evidence, it is would be unreasonable for a jury to find otherwise.

Sershen argues that in fact she was not back on the property, and therefore she did not trespass. (Sershen Dep. 70:20-71:4.) While Sershen may in fact have been innocent of defiant trespass, that is not the standard for probable cause. As Sershen stated in her deposition, the municipal property where she was allegedly standing ran between the house and the neighbor's property, and was not clearly marked along most of its length. (Sershen Dep. 30:20-24, 31:17-23.) An objectively reasonable officer would have no reason to believe that this portion of the grassy yard belonged to the municipality, as compared to the remainder of the Barth property. From Cholish's point of view, Sershen returned to the Barth property and had walked back even with the rear of the house, despite an explicit warning not to do so. Even if Sershen was actually innocent, Cholish was reasonable to believe that an offense was being committed, and therefore Sershen's arrest was based upon probable

---

[7] The Pennsylvania criminal defiant trespass statute states:
  (1) A person commits an offense if, knowing that he is not licensed or
    privileged to do so, he enters or remains in any place as to which
    notice against trespass is given by:
      (i) actual communication to the actor;
18 P.S. § 3503(b).

cause.  Sershen also argues that Cholish needed probable cause to arrest her specifically for disorderly conduct.  (Brief in Opposition at 4, Doc. 95.)  An arrest, however, can be for multiple offenses and here there is no question that Cholish had probable cause to arrest for defiant trespass.[8]

Sershen's causes of action for violations of the Fourth Amendment (Count I), violations of the First Amendment (Count II), false imprisonment (Count III), and malicious prosecution (Count IV) are all defeated by the existence of probable cause.  *Wright v. City of Phila.*, 409 F.3d 595, 601 (3d Cir. 2005) (Fourth Amendment); *Pulice v. Enciso,* 39 Fed. App'x 692, 696 (3d Cir. 2002) (not precedential) (First Amendment); *Id.* (false imprisonment); *Bradley v. Gen. Accident Ins. Co.*,778 A.2d 707, 710 (Pa. 2001) (malicious prosecution). Therefore, Cholish's motion for summary judgment will be granted as to Counts I, II, III, and IV, and Sershen's motion for summary judgment will be denied.

B.  Procedural Due Process (Counts V, VI, and VIII)

At Counts V, VI, and VIII, Sershen alleges that Lemoncelli, Harvey, and the Borough of Archbald violated her property rights under the Fourteenth Amendment without due process of law.  (Amend. Compl. ¶¶ 83,  87, 96.)  As both parties' arguments focus on the issue of notice, these claims will be analyzed as arising under the procedural component of the Due Process Clause of the Fourteenth Amendment.

Analysis of a procedural due process claim proceeds in two (2) steps.  First, I must determine whether Sershen has alleged that she had a protected property interest.  As

---

[8]  Depending upon the version of events believed, there may also have been probable cause to arrest Sershen for disorderly conduct.  Because of the genuine disputes of fact, however, it is inappropriate for this Court cannot make such a determination at this time.

18

Sershen has provided unrefuted evidence that she was a co-owner of the Barth property, she has satisfied this first step. (Deed to Barth property, Doc. 66 Ex. 34.) The second step in the analysis is whether Sershen was provided the process to which she was entitled. This question itself involves a three (3) part test. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). In determining whether the Plaintiff's procedural due process rights have been violated, the court must weigh: (1) the private interest affected by the government action; (2) "the risk of an erroneous deprivation" of the private interest through the procedures used by the government, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the government function at issue and the fiscal and administrative burdens that additional or substitute procedural safeguards would require. *Id.* at 335.

1. Lemoncelli and Harvey

The evidence on the record clearly demonstrates that Lemoncelli and Harvey both conducted inspections of the Barth property, and recommended to the Borough Council that the home be demolished. (Lemoncelli Dep. 98:3-6, 98:20-99:3.) There is, however, a genuine dispute of material fact as to whether Sershen was provided timely and appropriate notice of the demolition. Sershen argues that she first learned of the demolition on August 19, 2006, and only spoke with Lemoncelli after seeing the workers on the property. (Sershen Dep. 215:9-11.) She also argues that no signs were posted on the property. (Bay Dep. 37:1-3; Sershen Dep. 54:4-13.) Lemoncelli and Harvey argue that attempts to contact Sershen were made (Giordano Dep. 55:11-18), that Lemoncelli spoke with Sershen about the demolition (Lemoncelli Dep. 170:16-20), and that notice was continuously posted on the

property (Lemoncelli Dep. 57:18-25). Because the issue of notice to Sershen will be critical to the determination of whether due process was afforded, summary judgment is not appropriate for either party. The motions for summary judgment as to Counts V and VI will be denied.

2. Borough of Archbald

A municipality may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). A plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" in order to prevail. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). For instance, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembauer v. Cincinnati*, 475 U.S. 469, 480 (1986). For example, a single decision by a municipality's properly constituted legislative body "unquestionably constitutes an act of official government policy." *Id.*

There are two genuine issues of material fact that prohibit the motions for summary judgment with respect to the Borough of Archbald from being granted. First, as stated above there is a genuine factual dispute as to whether appropriate notice was provided to Sershen. *See supra* Part B.1. Second, there is a genuine dispute of fact as to whether the Borough Council actually voted to approve the demolition, or whether the issue was only discussed. (*Compare* Giordano Dep. 79:22-80:1 *with* Lemoncelli Dep. 101:17-102:4.) Because each of these questions are material to the determination of whether the Borough of Archbald

20

violated Sershen's due process rights, the motions for summary judgment with respect to due process at Count VIII will be denied.

C. Fourth Amendment (Count VII)

Sershen alleges at Count VII that Lemoncelli and Harvey violated her Fourth Amendment rights by conducting searches of the Barth property without a warrant. The Supreme Court has held that administrative searches to determine whether private property complies with safety, health, and fire codes "are significant intrusions upon the interests protected by the Fourth Amendment" and that they are searches which require a warrant. *Camara v. Mun. Court of City and County of S.F.*, 387 U.S. 523, 534 (1967). The Court clarified that "nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations." *Id.* "On the other hand," the Court continued, "in the case of most routine area inspections, there is no compelling urgency to inspect at a particular time or on a particular day." *Id.*

The evidence on the record clearly demonstrates that both Lemoncelli and Harvey conducted warrantless searches without consent. (Lemoncelli Dep. 89:17-90:10; Harvey Dep. 127:18-128:5.) Both Lemoncelli and Harvey argue that there was an emergency situation at the property which necessitated their warrantless searches. A determination of whether there was an emergency situation depends upon the condition of the Barth property. There is a genuine dispute of fact as to whether the home on the Barth property had deteriorated to into an emergency condition. Harvey believed that the property was an imminent threat to the neighborhood because of the risk of a fire. (Giordano Dep. 21:4-20, 24:2-8, 64:7-14; Harvey Dep. 87:14-88:7.) Sershen disputes this conclusion, and argues that the damage to the home was not so extensive as to make it an imminent danger.

21

(Sershen Dep. 202:3-203:25, 206:25-208:9.)  Because this genuine dispute is material to whether Lemoncelli and Harvey were permitted to conduct their searches without first obtaining warrants, the motions for summary judgment as to Count VII will be denied.

D.  Fifth Amendment (Count VIII)

Plaintiff alleges that the Borough took her property without providing her just compensation, in violation of the Fifth Amendment's Takings Clause.  U.S. CONST. amend V.  The Defendants argue that the demolition of the building was not a taking, but was instead only an exercise of police power for which no compensation is necessary.  While eminent domain is a taking to provide a public benefit requires just compensation, an exercise of police power "to promote the common good" is not compensable.  *New Jersey v. United States*, 91 F.3d 463, 468 (3rd Cir. 1996); *see United States ex rel. and for Use of Tennessee Valley Authority v. Powelson*, 319 U.S. 266, 284 (1943) (state may destroy or diminish values by assertion of police power without making compensation for the loss).  If, however, the police power regulation goes too far, it will be recognized as a taking.  *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  Determining "how far is too far," is a question left to "essentially ad hoc, factual inquiries."  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)*.*

Courts have found no compensation necessary in situations where the government destroys property to protect the public from a dangerous condition.  *See e.g.*, *Miller v. Schoene*, 276 U.S. 272, 278 (1928) (permitting state entomologist to enter property and destroy diseased trees without affecting a taking); *Bowditch v. Boston*, 101 U.S. 16, 18-19 (1880) (denying compensation to owners whose houses were destroyed to prevent spread

22

of fire); *Shaffer v. City of Winston*, 576 P.2d 823, 824-25 (finding that city may enter to demolish substandard vacant building without compensating owner).  The demolition of a dangerous structure has been found to be an exercise of police power, rather than a taking without compensation.  *Estate of Blose ex re. Blose v. Borough of Punxsutawney*, 889 A.3d 653, 659 (Pa. Commw. Ct. 2005).  The police power may only be used to demolition a structure where there is an imminent danger or a nuisance.  *See King v. Leacock*, 552 A.2d 741, 744 (Pa. Commw. Ct. 1989); *Stein v. City of Philadelphia*, 557A.3d 1137, 1139-40 (Pa. Commw. Ct. 1989).  As stated above, there is a genuine dispute as to the condition of the home on the Barth property.  Because the existence of an emergency or dangerous condition will also be central to the Fifth Amendment Takings Clause claim, both motions for summary judgment will be denied.

E.  Civil Conspiracy (Counts XI and XII)

1.  Section 1983

Sershen argues that Cholish, Harvey, and Lemoncelli collectively conspired to deprive her of her constitutional rights.  Sershen first argues that these Defendants conspired in violation of § 1983.  In order to establish a conspiracy claim against the Defendants pursuant to Section 1983, there is a requirement of "(1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right."  *Williams v. Fedor*, 69 F. Supp. 2d 649, 665 (M.D. Pa. 1999) (Vanaskie, J.), *aff'd* 211 F.3d 1263 (3d Cir. 2000) (citing *Kerr v. Lyford*, 171 F.3d 330, 340 (5th Cir. 1999)).  "'To demonstrate a conspiracy under § 1983, a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right

under color of law.'" *Id.* at 666 (citing *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir.1993)).

After reviewing the record in the light most favorable to the Plaintiff, I find that there is insufficient evidence to demonstrate an agreement between Cholish, Harvey, and Lemoncelli. While Sershen cites to a number of facts to demonstrate that unlawful activity occurred, she points to only one piece of evidence to prove the existence of an agreement between the Defendants: that Lemoncelli knew what steps Harvey was taking to demolish the home. (Sershen Statement of Facts ¶ 182, Doc. 66.) Even considering this statement in the light most favorable to Sershen (Lemoncelli Dep. 166:1-12), this fact standing alone fails to demonstrate a civil conspiracy. There is evidence that Harvey did not know what Lemoncelli was doing (Lemoncelli Dep. 165:22-25), and there must be an agreement among the conspirators. The evidence also demonstrates that there was no interaction between them beyond Lemoncelli's role as a Borough official (Harvey Dep. 50:2-8, 9-16). Furthermore, there is no evidence any communication or agreement by either Lemoncelli or Harvey with Officer Cholish. The evidence does not support a claim for civil conspiracy under § 1983. The motion of Defendants Cholish, Harvey, and Lemoncelli will be granted.

2. Pennsylvania Law

Sershen next argues that Cholish, Harvey, and Lemoncelli committed civil conspiracy under Pennsylvania law. To state a claim for civil conspiracy under Pennsylvania law, a complaint must allege:

> (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.

24

*McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000). Moreover, if there is no civil cause of action for a particular act, there can be no cause of action for conspiracy to commit that act. *Id.* As discussed above, Plaintiff has failed to demonstrate that there was a common purpose among these defendants, and therefore the Defendants' motion for summary judgment on this issue will be granted.

Sershen also argues that Stillwater entered into an agreement and combined with others to engage in unlawful conduct, depriving her of her state law common rights. Sershen correctly argues that civil conspiracy may be proven by circumstantial evidence. *Rumbaugh v. Beck*, 601 A.3d 319 (Pa. Super. Ct. 1991). She fails, however, to point out any evidence which demonstrates that Stillwater conspired with anyone to cause the alleged harms. Because there is insufficient evidence to demonstrate a conspiracy joined by Stillwater, Defendant Stillwater's motion for summary judgment will be granted.

F. Immunity

Defendants Cholish, Lemoncelli, and Harvey assert that they are entitled to qualified immunity.[9] "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining whether qualified immunity applies is a two-step process: "First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right." *Williams v. Bitner*, 455 F.3d

_____

[9] Defendants Cholish, Lemoncelli, and Harvey also argue that they are immune from the Pennsylvania causes of action under the Pennsylvania Subdivision Tort Claims Act ("PSTCA"). As I have already found that summary judgment is appropriate for the Defendants on each of the state law claims, I need not apply PSTCA immunity.

186, 190 (3d Cir. 2006). Second, "the court must determine whether the constitutional or statutory right allegedly violated by the defendant was 'clearly established.'" *Id*. A right is clearly established when its meaning is "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The United States Supreme Court recently held there is no mandatory sequence in applying the two steps of the analysis. *Pearson v. Callahan*, --- U.S. ---, 129 S. Ct. 808, 2009 U.S. LEXIS 591 (2009).

As to Defendant Cholish, a reasonable official in his position would believe that he had probable cause to arrest, and that therefore, he was not violating any constitutional rights.[10] Therefore, Cholish's motion for summary judgment on grounds of qualified immunity will be granted. As to Lemoncelli and Harvey, as discussed above, there are issues of fact as to whether a reasonable official in the position of either Lemoncelli or Harvey would understand that they were acting in violation of Sershen's rights. For example, if it was reasonable to believe that there was an emergency condition, or that proper notice had be given, then they would be entitled to qualified immunity. If instead it was not reasonable, and they acted knowing that they would be violating Sershen's rights under the Fourth, Fifth, and Fourteenth Amendments, then they would not be entitled to qualified immunity. Because there are still genuine issues of material fact with respect to their actions, Lemoncelli and Harvey's motions for summary judgment on grounds of qualified immunity will be denied.

---

[10] This belief was not only reasonable, but in fact correct as a matter of law. *See supra* Part A.

G.  State Law Torts

1.  Conversion (Count IX)

Sershen argues that Stillwater should be held liable for the unlawful conversion of materials from her home, namely the lumber and window taken by Bronson.  Under Pennsylvania law, conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir.1995).  Conversion requires an act intended to effect chattel, and an intent to exercise dominion over that chattel inconsistent with the owner's rights.  *Project Development Group v. OH Materials*, 766 F. Supp. 1348, 1355 (W.D. Pa. 1991) (citation omitted).  Here there is undisputed evidence that Bronson, after being granted permission by Noldy, removed the materials from the home.  (Bronson Dep. 16:6-16, 23:19-21.)  This represents intentional conduct, directed at the chattel.  A genuine dispute of material fact, however, remains as to whether it was taken without the owner's consent.  If the Borough of Archbald properly exercised its police power to take temporary control of the property, then they could give consent for Stillwater, and thus ultimately Bronson, to remove the materials from the Barth property.  If instead the Borough unlawfully authorized the demolition, then Sershen was the lawful owner from whom consent was not obtained.  Because liability for conversion will necessarily depend upon the same disputed facts discussed previously with respect to the proper exercise of Archbald's police power, both parties' motions for summary judgment will be denied.

2.  Negligence (Count X)

Sershen argues that Stillwater is liable under the theory of negligence for demolishing the home on the Barth property.  Specifically, she argues that Stillwater was negligent in their investigation as to whether the demolition had been properly authorized.[11]  The necessary elements to maintain an action in negligence are: a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; a failure to conform to the standard required; a causal connection between the conduct and the resulting injury and actual loss or damage resulting to the interests of another. Prosser, Law of Torts, § 30 at 143 (4th ed. 1971). *See Macina v. McAdams*, 421 A.2d 432, 434 (1980).  Whether a duty exists under a particular set of facts is a question of law. *Huddleston v. Infertility Center of America, Inc.*, 700 A.2d 453, 457 (Pa. Super. Ct. 1997). "It has long been hornbook law that a duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." Id. (quoting *Amarhanov v. Fassel*, 658 A.2d 808, 810 (1995)).  Stillwater, acting as a demolition contractor, had a duty to act reasonably to avoid risk of harm to the persons or property of those likely impacted by Stillwater's conduct.  Specifically, it would be foreseeable that Stillwater could risk harm to anyone or anything located on the Barth property during the demolition process.  Therefore, Stillwater had a duty to act reasonably to protect such persons or property.  Sershen argues that Stillwater failed to act reasonably by demolishing the home when it knew that she, as the owner, had not authorized the

---

[11]   Sershen argues that there is a theory under Pennsylvania law for "negligent demolition" citing *Pittsburgh v. Pivirotto*, 502 A.2d 747 (Pa. Commw. Ct. 1985).  *Pivirotto*, however, was about the government's failure to provide due process notice to an owner before demolition, not about negligence.  Sershen's allegations at Count X will be considered under a general theory negligence.

demolition.  Stillwater argues that it was reasonable in relying upon the contract awarded by the Borough.  The issue of whether Stillwater acted reasonably is a question for the jury, and therefore summary judgment for both parties will be denied.

Additionally, Stillwater argues that Sershen cannot demonstrate causation because any contractor hired would have demolished the property, citing *Stacey v. City of Hermitage*, 2009 U.S. Dist. LEXIS 18349 (W.D. Pa. Mar. 11, 2009).  The Court in *Stacey*, however, examined proximate causation as to whether the demolition contractor could be labeled a state actor.  *Id.* at *22.  It did not hold, nor would it make sense to hold, that a contractor was excused for a negligent act simply because another competitor might have made the same mistake.  Once Stillwater received the contract, they were required to act in a reasonable fashion in completing it.  This included taking reasonable steps to avoid unwarranted damage to anyone or anything on the Barth property.

H.  Punitive Damages

The Archbald Defendants request that summary judgment be granted in their favor as to any claims for punitive damages, arguing that Sershen has failed to provide any evidence which would support such claims.  In suits brought pursuant to 42 U.S.C. § 1983, punitive damages may be recovered from individual officers but not from government entities, if the officers "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Sershen argues that she has disputed the Defendants' assertions that her property was in a dangerous condition and that she was given notice of the demolition, and that therefore there are issues of material fact remaining.  (Sershen Brief in Opposition, Doc. 95 at 23.)  While there are issues of material fact as to whether

Sershen's rights were violated, she has provided no evidence of why punitive damages should be awarded beyond the compensatory damages she seeks for those violations. Sershen provides no evidence that the Archbald Defendants targeted her or her property because of any animosity, spite, or evil underlying justification. For example, the evidence does not demonstrate that the Archbald Defendants destroyed the home for no reason at all or for their personal benefit, it demonstrates that they acted to remove either a nuisance or a dangerous structure. The evidence also does not support any argument that the Archbald Defendants were callous or reckless in the demolition of the Barth property. The evidence instead demonstrates that several inspections were conducted and that it was determined that the home needed to be demolished. At worst, the evidence suggests that Archbald Defendants failed to take the necessary procedural steps and failed to provide Sershen with just compensation; the record before this Court would not support a finding of punitive damages. Because Sershen has provided no evidence of conduct rising to the level necessary for punitive damages, the Archbald Defendants' motion for summary judgment as to claims of punitive damages will be granted.

## CONCLUSION

The court will grant in part and deny in part the motions for summary judgment of the Defendants as discussed above. Specifically, summary judgment will be granted on Counts I through IV because Cholish had probable cause to arrest Sershen, or in the alternative Cholish is shielded by qualified immunity. Summary judgment will also be granted with respect to Counts XI and XII because Sershen fails to present sufficient evidence in support the claims of civil conspiracy. Finally, any summary judgment will be granted for the

30

Archbald Defendants as to any claims for punitive damages because Sershen fails to present sufficient evidence to support those claims.  As to the remaining claims, genuine issues of material fact remain which make summary judgment inappropriate.   The court will deny the motion for summary judgment by Sershen.

An appropriate Order follows.


  December 17, 2009                                /s/ A. Richard Caputo
Date                                                              A. Richard Caputo
                                                                    United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARY SERSHEN,

     Plaintiff,

       v.

EUGENE CHOLISH, et al.,

     Defendants.

CIVIL ACTION NO. 3:07-CV-1011

(JUDGE CAPUTO)

## <u>ORDER</u>

**NOW**, this  17th  day of December, 2009, **IT IS HEREBY ORDERED** that:

(1) Plaintiff Sershen's Motion to Strike Docket Numbers 102 & 103 (Doc. 104) will

    be **GRANTED** as to exhibits attached to Docket Number 102, and otherwise

    **DENIED**.

(2) Plaintiff Sershen's Motion for Summary Judgment (Doc. 64) is **DENIED**.

(3) Defendant Stillwater's Motion for Summary Judgment (Doc. 72) is **GRANTED**

    as to Count XII and **DENIED** as to the remainder.

(4) Defendants the Borough of Archbald, Cholish, Harvey, and Lemoncelli's Motion

    for Summary Judgment (Doc. 79) will be **GRANTED** as to Counts I - IV,

    Count XI, and all claims for punitive damages, and **DENIED** as to the

    remainder.


        /s/ A. Richard Caputo
        A. Richard Caputo
        United States District Judge